## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

GREGORY QUINTANA,

     Plaintiff,

     vs.                                              Civ. No. 19-1080 KK

ANDREW SAUL, Commissioner of the
Social Security Administration,

     Defendant.

### MEMORANDUM OPINION AND ORDER[1]

    **THIS MATTER** is before the Court on Plaintiff Gregory Quintana's ("Mr. Quintana")

Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 20)

("Motion"), filed April 27, 2020. Defendant Andrew Saul, Commissioner of the Social Security

Administration ("Commissioner"), filed a brief in Response in opposition to the Motion on July

17, 2020, (Doc. 23), and Mr. Quintana filed his Reply in support of the Motion on August 10,

2020, (Doc. 24).  Mr. Quintana seeks review of the Commissioner's unfavorable decision on his

claim for Title II disability insurance benefits ("DIB") under 42 U.S.C. § 405(g).  He asserts that

the ALJ improperly discounted the opinion of consultative examiner Diane Clawson, D.O., and

that the Appeals Council erred in declining to consider his newly submitted evidence. (Doc. 20 at

9-18.) The Commissioner in turn contends that the ALJ reasonably discounted Dr. Clawson's

opinion and gave valid reasons supported by substantial evidence for doing so, and that the new

medical evidence would not have changed the ALJ's decision. (Doc. 23 at 11-16.)  Having

meticulously reviewed the entire record and the applicable law, and being otherwise fully

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case.  (Doc. 9.)

advised in the premises, the Court concludes that the ALJ committed harmful error in his consideration and analysis of Dr. Clawson's opinion.  Because this error requires remand, the Court **GRANTS** Mr. Quintana's Motion without addressing his second argument.

## I.      Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In undertaking its review, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues de novo. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

A decision is based on substantial evidence where it is supported by "relevant evidence . . . a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2006). A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *id.*, or "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The Commissioner's decision must "provide this Court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an administrative law judge ("ALJ") is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for

finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

## II.     Applicable Law and Sequential Evaluation Process

A claimant establishes a disability when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a). In order to determine whether a claimant is disabled, the Commissioner follows a five-step sequential evaluation process ("SEP"). *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1520.

At the first four steps of the SEP, the claimant bears the burden of showing the following: (1) he is not engaged in "substantial gainful activity"; (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and, either (3) his impairment(s) meet or equal one of the "listings" of presumptively disabling impairments or (4) he is unable to perform his "past relevant work." 20 C.F.R. § 404.1520(a)(4)(i-iv); *Grogan*, 399 F.3d at 1261.

If the claimant can show that an impairment meets or equals a listing at step three, the claimant is presumed disabled and the analysis stops. 20 C.F.R. § 404.1520(a)(4)(iii). If not, the ALJ must next consider all of the relevant medical and other evidence and determine what is the "most [the claimant] can still do" in a work setting despite his physical and mental limitations. 20 C.F.R. § 404.1545(a)(1)-(3). This is called the claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1545(a)(1), (a)(3). The claimant's RFC is then used at step four of

the process to determine if he can perform the physical and mental demands of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv)(e).

If the ALJ determines the claimant cannot engage in past relevant work, the ALJ proceeds to step five of the SEP. 20 C.F.R. § 404.1520(g)(1); *Grogan*, 399 F.3d at 1261. At step five, the Commissioner bears the burden of showing the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. *Grogan*, 399 F.3d at 1261.

## III.    Background

Mr. Quintana is a fifty-eight-year-old divorced father of nine living with his daughter and two grandchildren in Los Lunas, New Mexico. (AR 236, 157-58, 801.[2]) He worked as a commercial painter from 1999 to 2011, when he claims to have become disabled. (AR 161-62, 492, 556.) Mr. Quintana filed a Title II application for disability insurance benefits on October 10, 2013, alleging a disability onset date of February 20, 2011. (AR 235, 264, 424.) He reported being unable to work due to right arm problems, knee problems, back problems, diabetes, and high blood pressure. (AR 475.) Mr. Quintana's application was denied initially on February 20, 2014, (AR 246), and again upon reconsideration on September 4, 2014, (AR 259). Mr. Quintana requested a hearing before an ALJ on September 24, 2014.  (AR 291.) On July 15, 2016, Mr. Quintana appeared for a hearing before ALJ Raul Pardo with impartial vocational expert ("VE") Pamela Bowman and attorney Brian Grayson. (AR 188, 533.) On November 29, 2016, ALJ Pardo issued an unfavorable decision finding that Mr. Quintana had not been under disability since his alleged onset date. (AR 264-272.)  Mr. Quintana sought and obtained review by the Appeals Council.  (AR 277-279.) On October 18, 2017, the Appeals Council remanded his case

---

[2] Citations to "AR" are to the Administrative Record (Doc. 13) that was lodged with the Court on January 22, 2020.

for rehearing finding the ALJ had erred by failing to (1) provide Mr. Quintana with a supplemental hearing as requested and (2) determine whether other work existed in significant numbers after Mr. Quintana became categorized as an "individual of advanced age" on November 22, 2016.[3] (AR 277-279.)

At Mr. Quintana's rehearing on November 18, 2018, he appeared before ALJ Jeffrey Holappa with VE Suzette "Bridget" Skinner and attorney Laura Johnson. (AR 149, 561.) On December 3, 2018, ALJ Holappa issued a partially favorable decision finding that Mr. Quintana was not disabled from his alleged onset date of February 20, 2011 through November 21, 2016, but that he was disabled from November 22, 2016 through the date of the decision. (AR 37.) Mr. Quintana again sought review by the Appeals Council and submitted new medical evidence as the basis of his appeal. (AR 11-22, 415-422.) The Appeals Council denied Mr. Quintana's request for review, finding the "evidence [did] not show a reasonable probability that it would change the outcome of the decision." (AR 2.) Mr. Quintana's petition to this Court followed. (Doc. 1)

### A.  Summary of Mr. Quintana's Relevant Medical History

Mr. Quintana's medical history includes past accidents, work injuries, and symptoms arising from multiple chronic conditions. Beginning with his history of accidents and work injuries, in 1987, Mr. Quintana injured his right arm in a motor vehicle accident. (AR 1152.) Following the accident, Mr. Quintana told providers that he continued to feel lingering diffuse numbness in his right forearm and the back of his right hand. (AR 741, 1152.) From October 2008 to November 2010, Mr. Quintana sought treatment with pain and rehabilitation specialist Pamela Black, M.D., for a work-related injury to his right arm. (*See* AR 621-624, 737-746.) At

---

[3] Before November 22, 2016, Mr. Quintana was categorized as a "younger individual." (AR 36.)

these appointments, he described pain and stiffness in his right hand, digits, and wrist, resulting in decreased functionality. (*See* AR 623, 739, 744.) At his September 2009 appointment with Dr. Black, Mr. Quintana also complained of neck pain, tenderness, and stiffness. (AR 741.) With treatment and over time, Mr. Quintana reported some improvements in his pain. (*See, e.g.,* AR 741.) Yet, even at his final appointment with Dr. Black in November 2010, Mr. Quintana reported continued pain in his right hand, particularly in his digits and wrist, with continued decreased functionality. (AR 737.)

In the past, Mr. Quintana has also complained of left-hand numbness and tingling, and in 1994, he underwent a left carpal tunnel release, which he reported did not significantly improve his symptoms. (AR 1152.) Additionally, in 2002, Mr. Quintana suffered a work injury that he reported resulted in progressively worsening numbness and tingling in his hands bilaterally. (AR 1152.) However, as it relates to the time period at issue, the record indicates that Mr. Quintana did not complain or seek treatment for symptoms specifically for his left hand until August 2018. (AR 1152, 1259.)

Mr. Quintana has symptoms arising out of a 1996 gunshot injury to his abdomen, for which he underwent multiple abdominal laparoscopic surgeries to treat a recurrent incisional hernia. (AR 882, 890, 911.) In January 2017, Mr. Quintana returned to a specialist with complaints of worsening abdominal hernia pain. (AR 882.) While surgery was initially planned, because of high blood sugar and blood pressure as well as "extensive adhesions," the surgery was aborted and postponed until late December 2017. (AR 911, 919, 921.)

Turning to Mr. Quintana's left knee impairment, in January 2011, just before his alleged onset date, Mr. Quintana tripped and fell at work, fracturing his left patella. (AR 632, 695.) His fracture was treated non-operatively with a knee immobilizer, and he was initially placed on

6

"light duty" by his treating orthopedist, Clayton Conrad, M.D. (AR 232, 692.) In March 2011, Dr. Conrad returned him to work at "regular duty." (AR 632, 685; *see also* AR 691.) Dr. Conrad continued to monitor Mr. Quintana for healing of his fracture and symptoms, and ultimately, on August 29, 2011, Dr. Conrad found Mr. Quintana had reached maximum medical improvement, though his clinical exam continued to show mild crepitus, minimal tenderness to palpitation, and "mild pain type symptoms." (AR 632, 688.) X-ray results at the time showed Mr. Quintana's fracture had healed. (AR 632, 688.) Upon discharge from his care, Dr. Conrad found that Mr. Quintana had a five percent lower extremity impairment and two percent whole person impairment. (AR 632.)

With respect to his neck impairment, in June 2015, Mr. Quintana sought treatment with orthopedist Robert Wallach, M.D., with complaints of pain that radiated from his neck into his hands and arms. (AR 747.) At the intake appointment, Dr. Wallach documented that Mr. Quintana walked with a normal gait, had full range of motion in his cervical spine and shoulders, and full strength on the right and left sides of his neck; however, reflexes in Mr. Quintana's right and left upper extremities were absent, and he was diffusely tender to palpitation through his entire cervical spine, shoulder girdles, and upper thoracic region. (AR 748.)  Results from an x-ray showed moderate disc space narrowing and facet degeneration at several levels on Mr. Quintana's cervical spine. (AR 748, 750.) Dr. Wallach noted that he "did not have a good explanation for his chronic pain…from his head throughout his entire neck" and recommended a course of physical therapy and an MRI of his cervical spine. (AR 748-749.) Like his x-ray results, results from an MRI taken in July 2015 revealed multilevel disc bulges, multilevel facet degeneration, and multilevel mild-to-moderate bilateral foraminal stenosis. (AR 750.) Again, Dr.

Wallach noted he did not "not have a good answer …in regards to [Mr. Quintana's] chronic widespread pain." (AR 752.)

One year later, in June 2016, Mr. Quintana returned to Dr. Wallach with reports that his neck pain had worsened. (AR 1257.) In addition, he described "headaches, pain in his eye sockets, hand pain, foot pain, extremity pain, neck pain, [and] back pain." (AR 1257.) Dr. Wallach noted his prior MRI results, diagnosed Mr. Quintana with chronic pain syndrome, and again wrote "he did not have a good explanation for [Mr. Quintana's] problem." (AR 1257.)

On July 25, 2016, at the direction of the State Agency, Mr. Quintana had x-rays of his right elbow, right knee, and lumbar spine. (AR 793-794.) Notably, despite the fact that Mr. Quintana primarily complained of and sought treatment for his *cervical* spine and his *left* knee, as previously discussed, the State Agency directed Mr. Quintana to obtain x-rays of his *lumbar* spine and his *right* knee. Results from the x-ray of Mr. Quintana's right elbow showed arthrosis and post-operative changes from a past fracture and internal fixation. (AR 795.)  Results from the x-ray of Mr. Quintana's right knee showed mild arthrosis and a possible "posterior medial loose body." (AR 796.) Finally, results from the x-ray of Mr. Quintana's lumbar spine showed mild degenerative disc disease. (AR 796.)

Mr. Quintana also manages several chronic diseases, including type II diabetes, hypertension, and sleep apnea. For treatment and management of his diabetes and hypertension, Mr. Quintana attended regular appointments with his primary care provider, Fatemeh Mansoori, F.N.P. (*See, e.g.,* AR 649, 650, 685, 721, 767, 1063-1068.) Records from these appointments document a range of findings as they related to Mr. Quintana's management of his diabetes. At times, F.N.P. Mansoori indicated that Mr. Quintana's blood sugar levels were poorly controlled. (*See, e.g.,* AR 767, 1063); yet, even when Mr. Quintana's blood sugar levels were high, there

were occasions on which he reported few or fleeting complaints, such as episodes of difficulty urinating or abdominal pain. (*See, e.g.,* AR 721, July 2014; AR 726, May 2014.) Indeed, at some appointments, Mr. Quintana reported that he was doing well and exercising and otherwise had no complaints. (*See, e.g.,* AR 729, November 2012; AR 650, August 2013; AR 656, May 2013; AR 725, May 2014; AR 729-730, January 2016.) In physical examinations at many of these appointments, F.N.P. Mansoori documented Mr. Quintana was "mildly" to "severely" overweight; he moved all his extremities; he walked with a normal gait; and he had full range of motion in his neck. (*See, e.g.,* AR 656, May 2013; AR 721, July 2014; AR 729, January 2016; AR 1036, March 2017; AR 1049-1050, October 2016; AR 1045-1046, November 2016.) In October 2016, Mr. Quintana's symptoms appeared to worsen, and he was seen twice with complaints of intermittent chronic tingling and numbness in his hands and legs and "arthralgia and neuropathy pain," which he reported was partially relieved with ibuprofen; F.N.P. Mansoori diagnosed him with diabetic peripheral neuropathy. (AR 1047-1050.) In December 2016, Mr. Quintana was seen with reports of lower back pain, spasms, and stiffness "off and on" for the last two weeks. (AR 1042.)

Beginning in early 2017, Mr. Quintana saw F.N.P. Mansoori more regularly with complaints of neck and back pain, "arthritic pain," stiffness, intermittent joint swelling, and spasms. (*See, e.g.,* AR 1040, January 2017; AR 1038, February 2017; AR 1036, March 2017; AR 1022, April 2017.) He also began reporting panic attacks and poor mood. (*See, e.g.,* AR 1022, April 2017; AR 1032, March 2017; AR 1028, May 2017.)

Mr. Quintana also sought treatment from an endocrinologist for management of his diabetes. (*See, e.g.,* AR 767-772, 1063-1068.) In November 2015, endocrinology specialist Donna Tomky, C.N.P., indicated Mr. Quintana's diabetes was "uncontrolled." (AR 768, 875.)

C.N.P. Tomky also wrote that Mr. Quintana's diabetes had progressed to diabetic peripheral neuropathy and documented decreased sensation in his feet. (AR 1063-1068.) Explaining further, Ms. Tomky stated Mr. Quintana was "symptomatic for hyperglycemia…polyuria, polydipsia, nocturia [and] fatigue." (AR 1066.) She noted a recent infection on his right arm that was treated with antibiotics. (AR 1066.) For treatment of his diabetes, she recommended changes to his medication as well as diet and lifestyle modifications. (AR 1066-1067.) At a follow-up appointment one week later, Ms. Tomsky documented improvement in Mr. Quintana's blood sugar levels, though she indicated he still required further adjustment in his insulin regimen. (AR 1074.)

Lastly, in June 2016, F.N.P. Mansoori referred Mr. Quintana for a sleep study due to his complaints known to be associated with sleep apnea. (AR 1296.) Results from the sleep study confirmed a diagnosis of severe obstructive sleep apnea, and Mr. Quintana was advised to pursue "PAP therapy" and at-home supplemental oxygen use. (AR 789, 1298.)

### B.  Dr. Clawson's Examination and Medical Opinion at Issue

In August 2016, Mr. Quintana attended a consultative examination with Diane Clawson, D.O. (AR 799.) Mr. Quintana reported a history of back, right arm, and left knee problems. (AR 799-800.)  Mr. Quintana rated his pain level as eight out of ten and reported that his symptoms affected his ability to stand, walk, bend, reach, handle, crouch, squat, and lift. (AR 799-800.) Mr. Quintana also described a history of high blood pressure dating back to 2012 and reported that blood pressure medication had not managed the condition well. (AR 800.) He described symptoms of frequent headaches, blurred vision, nausea, and vomiting approximately three times per week. (AR 800.) He also complained that these symptoms affected his ability to focus on work-related tasks. (AR 800.) Lastly, Mr. Quintana described a history of diabetes again dating

back to 2012, which he managed with insulin and oral medication. (AR 800.)  He outlined his current symptoms as neuropathy in his hands, legs, and feet, blurred vision, and open sores on his right foot. (AR 800.)

In her clinical examination, Dr. Clawson documented the following relevant findings: Mr. Quintana was able to lift, carry, and handle light objects; his hand-eye coordination was good but slow; he had hand weakness and reported dropping items frequently; he was unable to twist his right hand and arm; he had palpable muscle spasms in his left upper thoracic spine; he had swelling in his right arm but otherwise no atrophy in his hand muscles; he was able to perform both gross and fine manipulations; he had full strength—defined as five out of five—throughout except he had four out of five strength in his finger abduction and hand grip bilaterally; he had decreased sensation in his right arm; no reflex was elicited in his Achilles distributions or his right patellar distribution; he had a "noticeable" right hand deformity; he walked with a symmetric, steady, slow gait and his balance was "less than optimal"; he was able to squat and rise without assistance; he walked on his heels and toes with moderate difficulty; his tandem gait was abnormal; he could stand but not hop on each foot bilaterally; and finally he had range-of-motion limitations in his cervical spine and shoulders bilaterally, right worse than left, but otherwise normal range of motion. (AR 801-803.)

After summarizing her findings, Dr. Clawson provided the following narrative opinion with respect to Mr. Quintana's restrictions:

> [He] has severe limitations with sitting, standing and walking…[he] does not need an assistive device with regards to short and long distances and uneven terrain. He has severe limitations with lifting and carrying weight due to hand, arm, back and neck pain. [He has] limitations on bending, stooping, crouching, squatting and so on and [he] will not be able to perform these due to neck, back and leg pain. [He has] manipulative limitation on reaching, handling, feeling, grasping, fingering, and [he] will be able to perform these occasionally due to hand numbness, weakness and inability to reach above his head. There may be some relevant

visual limitations due to visual acuity of 20/50 [in the] left eye and 20/50 [in the] right eye without corrective lenses.

(AR 803-804.)

In addition, attached to her evaluation Dr. Clawson provided a form medical source statement. (AR 805-810.) In this form statement, Dr. Clawson indicated that Mr. Quintana had the following restrictions: he was limited to lifting and carrying up to twenty pounds occasionally; he was limited to sitting, standing, and walking 15 minutes at one time and one hour each in an eight-hour day; he was limited to occasional reaching, handling, fingering, feeling, pushing and pulling bilaterally; he was limited to occasional use of bilateral foot operations; he was limited to occasional climbing stairs and ramps, stooping, kneeling, crouching and crawling but should never balance or climb ladders or scaffolds; he should never work in the presence of unprotected heights, moving mechanical parts, extreme cold or heat, or vibrations; he could occasionally perform work involving the operation of a motor vehicle; and, he could occasionally work in the presence of humidity and wetness, dust, odors, fumes, and pulmonary irritants. (AR 805-809.) Finally, under a section entitled "Activity," Dr. Clawson indicated Mr. Quintana could not "walk a block at a reasonable pace on rough or uneven surfaces" or "use standard public transportation."  (AR 810.) With the exception of "Sitting/Standing/Walking," under each section of this form medical source statement Dr. Clawson wrote "per patient report." (AR at 805-810.)

## C.  The ALJ's Decision

At step one of the sequential evaluation process, the ALJ determined that Mr. Quintana has not engaged in substantial gainful activity since his alleged onset date. (AR 31.) At step two, the ALJ found that Mr. Quintana has the following severe impairments: diabetes mellitus,

obesity, degenerative disc disease of the lumbar spine, status-post left knee patella fracture, arthrosis of the right elbow, and hypertension. (AR 31.) At step three, the ALJ determined the severity of Mr. Quintana's impairments, considered singly or in combination, did not meet or medically equal any of the listed impairments in 20 C.F.R. part 404. Subpart P, Appendix One, also known as "the listings." (AR 31-32.) Next, in assessing Mr. Quintana's RFC, the ALJ found Mr. Quintana could perform light work, as defined in 20 C.F.R. § 404.1527(b). (AR 32.) The ALJ also included the following additional restrictions:

> [Mr. Quintana] retains the ability to lift and carry up to 20 pounds occasionally; lift and carry 10 pounds frequently. [Mr. Quintana] can sit, stand, and walk up to 6 hours in an 8-hour day; can push and pull as much as lift and carry, but is limited to occasional climbing of ramps and stairs; never climb ladder or scaffolds, and can occasionally balance, stoop, kneel, crouch, and crawl. [Mr. Quintana] is limited to frequent reaching overhead and all other [directions] with the right upper extremity and frequent bilateral handling, fingering, and feeling. [Mr. Quintana] is further limited to no exposure to extreme cold/heat, vibration, unprotected heights, or moving mechanical parts.

(AR 32.)

At step four, the ALJ found Mr. Quintana was unable to perform his past relevant work as a painter. (AR 35.) At step five, the ALJ determined Mr. Quintana had at least a high school education and could communicate in English. (AR 36.) Relying on testimony from the VE, the ALJ found that, from Mr. Quintana's alleged onset date through November 21, 2016, and considering Mr. Quintana's age, education, work experience, and RFC, he could perform other work as a routing clerk, marker, mailroom clerk, order clerk, addressor, and charge account clerk. (AR 36-37.) Upon finding Mr. Quintana was able to perform other work existing in significant numbers in the national economy, the ALJ concluded Mr. Quintana was "not disabled," as defined by 20 C.F.R. § 404.1520 (g), from February 20, 2011 through November 21, 2016. (AR 36-37.)

However, the ALJ found that beginning November 22, 2016, Mr. Quintana's age category changed from a "younger individual" to an "individual of advanced age." (AR 36.) As a result of this age-category change, the ALJ concluded that, pursuant to application of Medical-Vocational Rule 202.06, Mr. Quintana was unable to perform any work existing in significant numbers in the national economy. (AR 37.)

## IV.    Discussion

### A.   The ALJ Committed Harmful Error in His Consideration and Analysis of Dr. Clawson's Opinion

Mr. Quintana argues the ALJ's analysis of Dr. Clawson's opinion is flawed for several reasons. (Doc. 20 at 15.) First, Mr. Quintana asserts the ALJ's explanation that Dr. Clawson had a "short treating relationship" with Mr. Quintana is an inadequate reason for discounting an examining source opinion. (*Id.* (citing *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012)).) Second, Mr. Quintana contends the ALJ's assertion of purported inconsistencies in Dr. Clawson's opinion without more specific findings or explanation is not legally proper. (*Id.* at 16.)  Finally, Mr. Quintana notes that, in Dr. Clawson's evaluation, she did not mention having reviewed any medical records and in fact wrote that Mr. Quintana had not had any "recent MRI, CAT scan or x-rays" of his back, right arm, or left knee. (*Id.* at 17.) According to Mr. Quintana, it "stands to reason that Dr. Clawson may not have had the benefit of reviewing the x-rays cited by the ALJ, [particularly] given the close proximity of the dates at issue." (*Id.*) As a result, to the extent the ALJ was unsure whether Dr. Clawson took into account all relevant evidence, Mr. Quintana alleges the ALJ had a duty to develop the record in that he should have "recontacted the examiner to seek additional evidence or clarification." (*Id.* at 17.)

In response, the Commissioner contends the ALJ properly discounted Dr. Clawson's opinion on the basis that she was a one-time examiner, because this was not the only reason he

14

provided for discounting her opinion. (Doc. 23 at 14.) For example, the Commissioner points to the ALJ's observation that "Dr. Clawson said that many of the limitations [in her opinion] were not her own conclusion but 'per patient report.'" (*Id.* at 14-15 (quoting AR 34, 805-810).)  The Commissioner also notes that the ALJ considered the consistency of Dr. Clawson's evaluation with other evidence in the record, including Mr. Quintana's documented activities and x-ray results that showed only mild abnormalities. (*Id.* at 15.) The Commissioner maintains that these were valid reasons, supported by substantial evidence, for discounting Dr. Clawson's opinion. (*Id.*) In short, the Commissioner urges the Court to affirm the ALJ's decision because the ALJ gave valid reasons grounded in substantial evidence for discounting Dr. Clawson's opinion. (*Id.* at 16.)

The ALJ's decision must demonstrate application of the correct legal standards, and failure to follow the "specific rules of law . . . in weighing particular types of evidence in disability cases . . . constitutes reversible error." *Reyes v. Bowen*, 845 F.2d 242, 244 (10th Cir. 1988). Although ALJs need not discuss every piece of evidence, they are required to discuss the weight assigned to each medical source opinion and the reasons for that weight. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (citation omitted); 20 C.F.R. § 404.1527(c)(2). In particular, "if the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7.

As part of this process, the ALJ must consider several factors, *i.e.*: "(1) Examining relationship…; (2) Treatment relationship …; (3) Supportability…; (4) Consistency…; (5) Specialization…; and (6) Other factors…." 20 C.F.R. § 404.1527(c)(1)-(c)(6) (the "Section 404.1527 factors"); *see also Watkins v. Barnhart*, 350 F.3d 1297, 1300-01 (10th Cir. 2003). An

ALJ need not explicitly discuss every factor. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). However, "'an ALJ must give good reasons...for the weight assigned to a treating physician's opinion,' that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight.'" *Langley*, 373 F.3d at 1119 (quoting *Watkins*, 350 F.3d at 1301).

Additionally, the ALJ's stated reasons for the assigned weight must be supported by substantial evidence. *See Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003). Substantial evidence requires that an ALJ discuss uncontroverted evidence he chooses not to rely on, significantly probative evidence he rejected, and the evidence supporting his decision. *Clifton*, 79 F.3d at 1009. An ALJ need not delineate the direct correspondence between an RFC finding and a specific medical opinion. *Chapo*, 682 F.3d at 1288. Yet, the ALJ cannot "pick and choose" through a medical opinion, taking only the parts that are favorable to a finding of nondisability. *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007).

In his decision, the ALJ outlined Dr. Clawson's examination findings and narrative opinion. (AR 34.) The ALJ did not describe Dr. Clawson's opinion as provided in the medical source statement form attached to her evaluation. (*Compare* AR 34 *with* AR 805-810.) After outlining Dr. Clawson's relevant findings and her narrative opinion, the ALJ wrote that he gave "some weight" to Dr. Clawson's opinion because she had "a short treating relationship" with Mr. Quintana and "her opinion contain[ed] inconsistencies" making her opinion "less persuasive." (AR 34.) The ALJ also noted that Dr. Clawson made "no remarks about the x-rays, which showed only mild severity of the back, knees and hands." (AR 34.) Finally, the ALJ highlighted that Dr. Clawson wrote that her limitations were per Mr. Quintana's report. (AR 34.)

Preceding the ALJ's discussion of Dr. Clawson's evaluation findings, the ALJ outlined an adult function report completed for Mr. Quintana by his daughter, Alexia Quintana. (AR 33.) Specifically, the ALJ wrote that Mr. Quintana reportedly could care for his pets, walk without an assistive device, go shopping, drive, and manage money, but he was unable to cook. (AR 33 (citing AR 484-491).) The ALJ also found that Mr. Quintana's activities were not hindered "as he attends college and drives 1.5 hours multiple times during the week for college and doctor appointments….He also averages 36 hours of schoolwork where he engages in prolonged sitting, standing and walking contrary to Dr. Clawson's findings [at her] consultative examination." (AR 33.)[4]

Initially, the ALJ's assignment of "some weight" to Dr. Clawson's opinion is deficient because he did not specify how he apportioned that weight. *See Langley*, 373 F.3d at 1119 ("[A]n ALJ must give good reasons...for the weight assigned to a treating physician's opinion, that are sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion….") (citation and quotation marks omitted); *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004) (explaining that the "ALJ's analysis of Dr. Baca's opinion is deficient in several respects. First, the ALJ failed to articulate the weight, if any, he gave Dr. [Baca's] opinion") (citation and quotation marks omitted).  If the ALJ intended to adopt some portions but reject others, he was required to provide an explanation; to do otherwise, an ALJ would engage in impermissible "picking and choosing" of a medical opinion. *Haga*, 482 F.3d at 1208; *see also* SSR 96-8p, 1996 WL 374184, at *7 ("[I]f the RFC

---

[4] The adult function report the ALJ cited does not describe such activities. *See* (AR 484-491.) Instead, it appears Mr. Quintana testified to such activities at the 2016 hearing before ALJ Pardo. (AR 194-202.)  Apart from this one apparent reference, the ALJ did not describe or outline this portion of Mr. Quintana's testimony in his decision. (*See* AR 28-38.)

assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted."). While there are some areas of overlap between Dr. Clawson's opinion and the RFC assessment, the Court cannot speculate as to which portions the ALJ adopted and which he rejected.  Moreover, the Court cannot adopt an explanation for the ALJ's rejection of a portion of Dr. Clawson's opinion, while accepting some other portion, without engaging in impermissible *post-hoc* rationalization. *Haga*, 482 F.3d at 1207-08 ("[T]his court may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself.").

In addition to providing inadequate specificity in his weight assignment, the ALJ's rationale for discounting Dr. Clawson's opinion is flawed. An ALJ's rationale for his assignment of weight to a medical opinion must be tied to the Section 404.1527 factors *and supported by substantial evidence. See Langley*, 373 F.3d at 1119; 20 C.F.R. § 404.1527(c); *Doyal*, 331 F.3d at 764. Here, the explanations the ALJ provided for discounting Dr. Clawson's opinion appear tied to the Section 404.1527 factors,[5] however, his opinion analysis is insufficiently specific and is not supported by substantial evidence.  For example, the Court is strained to find "inconsistencies," as the ALJ alleged in his discussion of Dr. Clawson's opinion. In fact, Dr. Clawson's opinion is consistent with her clinical findings.  Dr. Clawson documented that during

---

[5] The explanation that Mr. Quintana's reported activities were inconsistent with Dr. Clawson's examination findings aligns most closely with the third and fourth Section 404.1527 factors—"Supportability" and "Consistency." 20 C.F.R. § 404.1527(c)(3)-(4).  Dr. Clawson's short treatment relationship with Mr. Quintana as a factor the ALJ weighed against the persuasiveness of her opinion most closely aligns with the second Section 404.1527 factor— "Treatment relationship." 20 C.F.R. § 404.1527(c)(2); *see generally Chapo*, 682 F.3d at 1291 (explaining that a short treating relationship "may be a valid reason not to accord" a consultative examiner's findings "the conclusive weight of a treating medical-source opinion, but…it is not by itself a basis for rejecting them."). The purported "inconsistencies" in Dr. Clawson's opinion most closely align with the fourth Section 404.1527 factor— "Consistency." 20 C.F.R. § 404.1527(c)(4). And the ALJ's fourth reason, that many of her limitations were "per patient report," would most closely align with the sixth Section 404.1527 factor—"Other factors." 20 C.F.R. § 404.1527(c)(6).

her examination Mr. Quintana exhibited hand weakness bilaterally with a "noticeable deformity in his right hand"; he was unable to twist his right hand and arm; he had swelling in his right arm; he had palpable muscle spasms in his left upper thoracic spine; he had decreased sensation in his right arm; reflexes in his Achilles tendons and right patellar distribution were absent; his balance was "less than optimal"; he could not hop on either foot; he could not walk with a tandem gait; and, he had restricted range of motion in his cervical spine and shoulders. (AR 801-803.) Taken together, these clinical findings are consistent with Dr. Clawson's narrative statement that Mr. Quintana has "severe limitations with sitting, standing and walking," "severe limitations with lifting and carrying weight," "limitations on bending, stooping, crouching, squatting," and is "occasionally" limited in "reaching, handling, feeling, grasping, fingering." (AR 803-804.)

The record also contains other significantly probative evidence that is consistent with Dr. Clawson's findings and opinion that the ALJ failed to address and consider. For example, in June 2015, Mr. Quintana saw his orthopedist Dr. Wallach with complaints of neck pain that radiated into his left and right arms. (AR 747.) In his examination, Dr. Wallach documented an absence of reflexes in Mr. Quintana's right upper extremity tendons. (AR 748.) Additionally, results from a subsequent MRI of Mr. Quintana's cervical spine revealed multilevel disc bulges, facet degeneration, and mild to moderate bilateral foraminal stenosis. (AR 748.) The ALJ failed to discuss the findings from this MRI, and in fact, apart from once mentioning Mr. Quintana's treatment with Dr. Wallach, failed to address Mr. Quintana's cervical spine abnormalities entirely. (*See* AR 31-35.)

Also, in October 2016, Mr. Quintana returned to his primary care provider, F.N.P. Mansoori, with reports of intermittent but chronic tingling and numbness in his legs and hands.

(*See* AR 1047, 1050.)  F.N.P. Mansoori diagnosed Mr. Quintana with diabetic peripheral neuropathy. (AR 1047, 1050.) Other providers have similarly documented decreased sensation in Mr. Quintana's feet, yet the ALJ completely omitted such findings from his decision. (*See* AR 1063-1068, 28-38.) With respect to Mr. Quintana's arm impairment, in January 2017, F.N.P. Mansoori noted the presence of a "deformity of [right forearm]," which she indicated was "not [a] new issue[]." (AR 1041; *see also* AR 1055, March 2017.)  In addition, in 2010, prior to the alleged onset date, Mr. Quintana's treating pain management doctor, Dr. Black, noted scarring over Mr. Quintana's right forearm, elbow, and deltoid. (AR 738.) The Court finds no discussion of these significantly probative findings in the ALJ's decision or in his analysis of Dr. Clawson's opinion.

The Commissioner offers Mr. Quintana's July 2016 x-rays to support the ALJ's inconsistency finding.  (Doc. 23 at 15 (citing AR 795-797).) However, these x-ray results fail to support the ALJ's treatment of Dr. Clawson's opinion. First, and significantly, because the State Agency erroneously ordered Mr. Quintana to obtain x-rays of his right knee rather than his left knee and his lumbar spine rather than his cervical spine, these x-ray results do not even address two of Mr. Quintana's primary impairments: his left knee fracture and his neck pain. (*See supra* Section III.A.)  Then, because an ALJ is required to discuss uncontroverted evidence he chooses not to rely on, significantly probative evidence he rejected, and the evidence supporting his decision, the ALJ's reference to these x-ray results alone—even if they could hypothetically be construed as inconsistent with Dr. Clawson's opinion—would not provide the substantial evidence necessary to support the weight he assigned. *See Doyal*, 331 F.3d at 764 (explaining that the ALJ's stated reasons for the assigned weight must be supported by substantial evidence).

The ALJ's description of Mr. Quintana's reported activities as a basis for discounting Dr. Clawson's opinion also fails this Court's substantial evidence review. (AR 33.) At the 2016 hearing, at which Mr. Quintana testified about his activities, ALJ Pardo rather peremptorily calculated the time Mr. Quintana spent driving to school and performing school work as roughly "36 hours [of] school work" and pointedly asked Mr. Quintana whether this a "fair estimate" of the time he spent on school per week. (AR 199-202.)  Mr. Quintana agreed that it was a "fair estimate," (AR 201), but also described several limitations he had in performing his school activities, including falling asleep in the car on the way to class, pain in his right hand, and frequent headaches, fatigue, and pain in his hands and feet. (AR 200-202.) While ALJ Holappa reported that Mr. Quintana spent thirty-six hours engaging in school-related activities, he failed to outline the remainder of Mr. Quintana's testimony in which he described limitations and challenges in carrying out his schoolwork. (*See* AR 28-38.) Again, substantial evidence requires the ALJ to discuss not only evidence supporting his decision but also significantly probative evidence he rejects and uncontroverted evidence he chooses not to rely on. *Clifton*, 79 F.3d at 1009. Here, the ALJ selectively picked testimony supportive of his conclusion without demonstrating consideration of evidence he rejected, such as Mr. Quintana's testimony that he had significant limitations in carrying out his school-related tasks. [6]

Turning to the ALJ's conclusion that Dr. Clawson's limitations were based on Mr. Quintana's reports and not her own findings and therefore deserved diminished weight, while Dr. Clawson did express reliance on Mr. Quintana's reports in her form opinion, (AR 805-810), she noted no such reliance in her narrative opinion, (AR 803-804).  Thus, and in light of her examination and objective findings, the Court cannot assume that Dr. Clawson's narrative

---

[6] The ALJ also omitted any discussion of Mr. Quintana's severe obstructive sleep apnea which could certainly explain why he has fallen asleep while driving to class. (*See* AR 28-38, 789, 1298.)

opinion was based on Mr. Quintana's reports.  Moreover, the Court finds Dr. Clawson's opinions regarding Mr. Quintana's limitations are consistent with her clinical findings and other record evidence, and thus, even if her opinions were based, in part, on Mr. Quintana's self-reported restrictions, their consistency with Dr. Clawson's objective findings only adds credibility to Mr. Quintana's reports.  Given the deficiencies in the above discussed rationales, the ALJ's final reason for discounting Dr. Clawson's opinion based on the short treating relationship, does not sufficiently justify the weight assessment and rejection of certain limitations Dr. Clawson assessed.  S*ee Chapo*, 682 F.3d at 1291 (explaining that a short treating relationship "may be a valid reason not to accord" a consultative examiner's findings "the conclusive weight of a treating medical-source opinion, but…it is not by itself a basis for rejecting them.").

In summary, the ALJ's reasons for discounting Dr. Clawson's opinion are not supported by substantial evidence. *See Clifton*, 79 F.3d at 1009 (explaining that substantial evidence requires that an ALJ discuss uncontroverted evidence he chooses not to rely on, significantly probative evidence he rejected, and the evidence supporting his decision). In his assignment of "some weight" to Dr. Clawson's opinion without further explanation, the ALJ failed to provide the specificity needed for the Court to properly assess which portions of Dr. Clawson's opinion he adopted and which he rejected. And while the ALJ provided several explanations for his assignment of weight tied to the Section 404.1527 factors, he failed to discuss and consider highly probative evidence supportive of Dr. Clawson's opinion.  For these reasons, the Court finds the ALJ's analysis of Dr. Clawson's opinion is legally insufficient. Furthermore, because Dr. Clawson's opinion is more limiting than the ALJ's RFC, the Court finds the ALJ's insufficient opinion analysis is a harmful legal error. *See generally Fischer-Ross v. Barnhart*, 431 F.3d 729, 733-34 (10th Cir. 2005) (Harmless error analysis, applied cautiously in the administrative review

setting, may be appropriate where the court can "confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.")  As such, the Court grants Mr. Quintana's request to remand on this basis.

**B.  The Court Does Not Reach Mr. Quintana's Other Arguments**

Because the Court concludes that remand is required as set forth above, the Court will not address Mr. Quintana's remaining claims of error. *See Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) (explaining that the reviewing court does not reach issues that may be affected on remand).

**V.     CONCLUSION**

For the reasons stated above, Mr. Quintana's Motion to Reverse and Remand for Rehearing with Supporting Memorandum, (Doc. 20), is GRANTED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent